UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| DOLLY YVONNE PARKS,<br><br>       *Plaintiff*,<br><br>   v.<br><br>HAROLD W. CLARKE, et al.,<br><br>       *Defendants*. | Case No. 3:22-cv-00029<br><br>MEMORANDUM OPINION<br>& ORDER<br><br>Judge Norman K. Moon |

  The plaintiff in this case is a former prisoner in Fluvanna Correctional Center for Women. She alleges that while she was incarcerated there, she suffered a series of escalating injuries after she fell from the ladder to her top bunk. Subsequent improvised medical care using hot water to treat her injured shoulder resulted in severe burns to her back, and a nurse at the prison inflicted substantial pain when she treated the burn wounds without prior medication. This matter is before the Court on the motion to dismiss of only those Defendants who were officials at the Fluvanna Correctional Center for Women and the Virginia Department of Corrections. Because Plaintiff's complaint only includes conclusory allegations of collective wrongdoing by these movant defendants, the Court will grant their motion to dismiss Plaintiff's Eighth Amendment deliberate indifference and supervisory liability claims.

Background

1. *The Parties*

  Plaintiff Dolly Parks is a former inmate at Fluvanna Correctional Center for Women ("FCCW"). Am. Compl. ¶ 10. Plaintiff sues various FCCW officials and an as-yet unidentified nurse, seeking damages for injuries she suffered in May 2020. *Id.* ¶¶ 2, 55, 74.

Defendants include Harold Clarke, Director of Virginia Department of Corrections ("VDOC"); David Robinson, Chief of Corrections Operations at VDOC; Stephen Herrick, Director of Health Services at VDOC; Mariea LeFevers, Warden of FCCW since June 2020; Eric Aldridge, Warden of FCCW from mid-2018 to May 2020; Dr. Paul Targonski, Medical Director at FCCW; a Defendant Nurse John/Jane Doe; and the Commonwealth of Virginia. *Id.* ¶¶ 11–18.

2. *History of Inadequate Medical Care*

Many of the allegations in Plaintiff's complaint are from years before her injuries. Plaintiff draws from a separate case pending in this Court—the *Scott v. Clarke* class action which had asserted Eighth Amendment violations against FCCW—in describing FCCW's "history of constitutionally inadequate medical care." *Id.* at p. 6; *see Scott v. Clarke*, No. 3:12-cv-36 (W.D. Va.). Plaintiff recounts that in 2016 the parties in that case entered into a settlement agreement, to ensure that the quality of medical care for prisoners residing at FCCW meets or exceeds the constitutional minimum. *Id.* ¶¶ 25–26. Plaintiff notes that Defendants Clarke and Robinson were parties in that suit since 2012; Defendant Herrick was named as a party in June 2018; and Defendant Aldridge was also named as a party in June 2018 but was replaced in August 2020 by Defendant LeFevers, his successor. *Id.* ¶ 23.

Plaintiff writes that, "[a]fter a June 2018 trial, this Court found that the defendants— including Clarke, Robinson, Herrick, and Aldridge—had breached the settlement agreement [in *Scott v. Clarke*], making several detailed findings of fact and conclusions of law about the constitutionally inadequate conditions" at FCCW. *Id.* ¶ 28. Plaintiff cites findings that from 2016 through early 2018, "the 'sick call' process was inadequate and ineffective, and served to substantially delay care," and that medical equipment and supplies "often were not readily

2

available at FCCW." *Id.* ¶ 30. Plaintiff further notes this Court's ruling that enjoined Defendants to require at least 78 full-time personnel at FCCW's medical department, including at least 29 registered nurses, and to ensure the availability of medical equipment. *Id.* ¶ 33. She alleges, upon information and belief, that FCCW employed less than 78 full time medical personnel at the time at issue in her case. *Id.* ¶ 35.

    3.  *Bottom-Bunk Designation*

Plaintiff maintained a "bottom-bunk profile" for approximately 15 years while incarcerated at FCCW. "On May 18, 2020, however, she was informed that she was to be moved to a new cell and reassigned to a top bunk that lacked guard rails." *Id.* ¶ 48.

Plaintiff previously had a "bottom-bunk profile" based on her "history of injury and medical problems related to her back, and FCCW possessed extensive documentation of this history." *Id.* ¶ 45. For instance, in 2004, Plaintiff fell down the stairs at FCCW and was admitted to its infirmary for five days, where she "reported back pain and underwent x-ray imaging of her lumbar spine and right hip." *Id.* ¶ 46. More recently, in February 2019, Plaintiff "slipped and fell again," and x-rays of the spine by a radiologist outside FCCW "showed signs of scoliosis, some degenerative arthritis, and evidence of prior trauma." *Id.* ¶ 47.

The next day, May 19, 2020, Plaintiff "requested a 30-day bottom bunk profile," but FCCW denied the request. *Id.* ¶ 50. Thereafter, Plaintiff submitted an "Informal Complaint" and "Regular Grievance" to request a bottom bunk profile. *Id.* ¶ 51. Plaintiff alleges that, on information and belief, "according to VDOC operating procedures, this grievance should have been forwarded to both Defendants Herrick and Aldridge." *Id.* Nevertheless, Plaintiff was denied the bottom bunk again, stating that she did not "qualify" under FCCW's policy. *Id.* ¶ 53.

On May 21, 2020—two days after she requested a bottom bunk—at around 5:00 a.m., Plaintiff climbed down from the top bunk to use the toilet. *Id.* ¶ 55. When she was climbing the ladder back to the top bunk, she felt unstable. Without guardrails, she "attempted (unsuccessfully) to stabilize herself by grabbing at a blanket tucked underneath the top bunk mattress," however, "[t]he blanket gave way and [Plaintiff] fell backwards, landing on the left side of her body." *Id.* Plaintiff could not get up on her own, and a fellow inmate helped her from the floor and notified an officer. *Id.* ¶ 56. "Eventually, two nurses arrived to check on [Plaintiff]. She indicated she could not lift her left arm." *Id.* ¶ 57. Plaintiff "was told that a nurse would write up the incident and request an x-ray after prison staff completed the daily count of inmates around 6:30 a.m." *Id.* At 8:00 a.m. that day, a sergeant on duty saw Plaintiff was injured and moved her to a single-prisoner cell where she wouldn't have to climb a ladder. *Id.* ¶ 58.

After another inmate suggested Plaintiff may have torn her rotator cuff, Plaintiff asked a nurse for a sling. *Id.* ¶ 59. She was given acetaminophen for pain "but was informed that she would not be eligible to receive a sling until x-ray results confirmed a sling was necessary." *Id.* Thereafter, Plaintiff submitted a "Health Services Appointment Request" form to request an x-ray, on which she stated: "I fell off the ladder trying to get to my bed. My shoulder is hurting so bad. I thought I would have been called to x-ray my left shoulder." *Id.* ¶ 60. However, Plaintiff did not receive an x-ray. A nurse responded: "if [Plaintiff] could fully move her arm," she should "'use heat' and continue to take NSAIDs" (acetaminophen) as scheduled until an x-ray was performed." *Id.* ¶ 62.

On May 27, 2020, Plaintiff submitted an "Informal Complaint" indicating she told three nurses she could not lift her arm and still had not been seen by a doctor. *Id.* ¶ 63. She also submitted an "Offender Request," seeking an appointment for an x-ray and to have her pain

4

medication rescheduled. *Id.* ¶ 68. Around this time, "out of necessity, [Plaintiff] fashioned her own approximation of a sling out of a gown." *Id.* ¶ 66.

   4. *Back Burns*

On May 27, 2020, at about 10:00 p.m., Plaintiff went to the pill line to receive NSAIDS, "only to learn that no pain medication had been ordered for that evening. Despite her pleas and reports that she was in a tremendous amount of pain, she was not given any pain medication." *Id.* ¶ 69.

When she returned to her cell, Plaintiff "decided to heed the nurse's instruction to 'use heat' on her shoulder for that purpose. Without a hot compress, but—upon information and belief—consistent with known practice in the facility, [Plaintiff] fashioned a hot compress using a combination of hot water, a disposable glove, and a sock." *Id.* ¶ 70. Plaintiff alleges that, "[u]pon information and belief, it was widely known by medical staff at FCCW that inmates in need of a therapeutic compress would 'make do' by either microwaving a wet towel or by pouring ice or hot water into a disposable glove—which inmates had easy access to in order to clean, serve food trays, or empty trash in the housing units." *Id.* ¶ 71. And then, the inmate would "t[ie] the glove off at the end." *Id.* In fact, an "infirmary nurse's notes from November 3, 2003, specifically 'encourage[d]' [Plaintiff] to use either a 'hot or cold glove' on another occasion when she was in need of a compress." *Id.* ¶ 72. Around 11:00 p.m., Plaintiff poured hot water into a disposable glove, tied it off, and placed it in the sock over her shoulder. "The glove quickly ruptured, and the scalding hot water poured down [Plaintiff's] back. She fell to the floor, screaming and crying in agony." *Id.* ¶ 74. "A chaotic scene ensured," wherein Plaintiff "found herself topless on the floor of her cell, surrounded by nurses screaming 'oh my God!', before

5

being taken to the prison infirmary." *Id.* ¶ 75. Plaintiff "suffered first-, second- and third-degree burns covering 70 percent of her back. She had 19 blisters." *Id.* ¶ 76.

    5.   *Treatment for Back Burns*

Plaintiff alleges that, for about four days after she received those back burns, she "received care exclusively from untrained or improperly trained medical staff" at FCCW. *Id.* ¶ 80. She was not transferred anywhere else. *Id.* ¶ 77. She alleges that "[a]mong the most shocking displays of indifference to [Plaintiff's] medical needs, she was only given Toradol, a[n] NSAID, to manage the compounding pain of a serious shoulder injury and serious burns covering 70 percent of her back." *Id.* ¶ 79. She alleges that her wounds were treated once without a saline solution, and on another occasion medical staff applied the wrong topical treatment because it was all they had on hand, so Plaintiff had to wait several hours for someone to apply the right burn cream after purchasing it from a drug store. *Id.* ¶¶ 80–82.

On June 2, 2020, a nurse from the University of Virginia Hospital System, trained in burn care, came to FCCW to treat Plaintiff's burns. She provided Plaintiff narcotic pain medication. *Id.* ¶ 83. She also took Plaintiff to a procedure room where she "gently removed dead skin from the site of the burn with tweezers and scissors, cleaned the affected area, and dressed the wound …." *Id.* ¶ 84. Plaintiff "experienced only mild discomfort during the procedure." *Id.* ¶ 85. Plaintiff alleges that, upon information and belief, some members of FCCW's medical staff observed the procedure, "as a form of training to treat [Plaintiff's] burns going forward." *Id.* ¶ 86.

On June 3, 2020, Defendant Nurse John/Jane Doe "inflicted serious and unnecessary pain … on [Plaintiff] during wound care at FCCW." *Id.* ¶ 87. Plaintiff was not provided any medication beforehand for pain management. *Id.* ¶ 88. And, rather than using "precision tools

6

(tweezers and scissors)" to "gently remove dead skin from the affected areas," Nurse Doe "proceeded to aggressively rub gauze directly against the wound on [Plaintiff's] back without first providing any medication for pain management." *Id.* Plaintiff alleges that she had to endure this because Defendant Dr. Targonski "had not yet given orders to premedicate [Plaintiff] 30 minutes before wound care." *Id.* ¶ 89. Plaintiff "cried and screamed in agony," but Defendant Nurse Doe "did not call for assistance," instead she "told [Plaintiff] to be quiet" and continued. *Id.* ¶ 90. Plaintiff alleges that this was the worst pain she'd ever experienced in her life. *Id.* ¶ 92. After this incident, the UVA nurse recommended two pain medications, including an opioid, and they were prescribed. *Id.* 93.

Plaintiff was ultimately released from prison on June 19, 2020. After she was released, Plaintiff was able to obtain an x-ray and MRI. She was diagnosed with a torn rotator cuff to her left shoulder. *Id.* ¶¶ 96–97.

6. *Procedural History*

Plaintiff filed suit against Defendants in May 2022. Thereafter, Defendants filed a motion to dismiss, and Plaintiffs filed an amended complaint on August 3, 2022. Dkt. 13. The Court denied as moot Defendants' original motion to dismiss. Dkt. 14.

Plaintiffs' amended complaint brought twelve claims against Defendants. However, only one claim is at issue: Plaintiff's claim for violation of her Eighth Amendment rights, brought pursuant to 42 U.S.C. § 1983, filed against Defendants Clarke, Robinson, Herrick, Aldridge, and LeFevers in their individual capacities. Am. Compl. ¶¶ 99–115.[1] Defendants have moved to

---

[1] Count Two is against Nurse John/Jane Doe, under Eighth Amendment and § 1983 as well, for "inhumane treatment" of Plaintiff's burns. *Id.* ¶¶ 116–21. Count Two proceeds, but John/Jane Doe has not been served. Plaintiff has consented to dismissal of the remaining ten claims in her opposition brief.

dismiss Plaintiff's Amended Complaint, briefing on the motion is complete, the Court has heard argument, and the motion is ripe for decision.

## Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This pleading standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4d 299, 305 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United. Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotes omitted).

## Applicable Law

"Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). A prison official

8

violates the Eighth Amendment when the official "demonstrates 'deliberate indifference' to an inmate's serious medical needs." *Id.* Such a claim includes objective and subjective elements. "The objective element requires a 'serious medical condition,'" while the subjective element requires that the prison official "acted with a 'sufficiently culpable state of mind,' specifically, 'deliberate indifference' to inmate health." *Langford v. Joyner*, --- F.4th ---, 2023 WL 2335957, at *2 (4th Cir. Mar. 2, 2023) (quoting originally *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference also requires that the official have "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* at *2 (quoting *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021)).

Plaintiff's Eighth Amendment claim against the Movant Defendants fails. The complaint includes only conclusory, collective allegations concerning the Movant Defendants, which do not plausibly establish the subjective element of her Eighth Amendment claim—that they acted with deliberate indifference to inmate health.

Plaintiff begins each of nine key allegations underlying her Eighth Amendment claim by collectively alleging that "Defendants Clarke, Robinson, Herrick, Aldridge, and LeFevers" were, for example, "aware of the pervasive patterns of constitutionally inadequate medical treatment provided by FCCW staff and VDOC's obligations under the Settlement Agreement," and were "supervisory officials responsible for the training, supervision, and control of staff making day-to-day decisions about medical need accommodations for inmates at FCCW, including Ms. Parks." *E.g.*, Am. Compl. ¶¶ 102–03; *id.* ¶¶ 100–06, 109, 111. Plaintiff alleges that "Defendants Clarke, Robinson, Herrick, Aldridge, and LeFevers, have long known that conditions at FCCW posed a pervasive and unreasonable risk that inmates"

- would be denied reasonable accommodations for serious medical injuries;

9

- would be denied adequate medical care through the Sick Call process;

- would be denied reasonable or timely review of her complaints and grievances;

- would be subjected to inadequate medical care due either to understaffing or the practice of delegating or assigning medical care to staff lacking the necessary medical training or the experience to appropriately treat inmates' medical needs;

- would be denied access to reasonably necessary medical supplies (such as a sling or a hot compress); [and]

- would be denied transfer to external facilities when FCCW was incapable of or unwilling to provide adequate care.

*Id.* ¶ 104.

However, Plaintiff alleges that "[n]otwithstanding their actual knowledge of these pervasive conditions, Defendants Clarke, Robinson, Heerick [sic], Aldridge, and LeFevers failed to take sufficient action to correct them," and—yet again—"Defendants Heerick [sic] Aldridge, and LeFevers failed or refused to adequately respond to the grievances and information complaints that [Plaintiff] filed." *Id.* ¶¶ 105–06.

Plaintiff blames the "failure by Defendants Clarke, Robinson, Heerick [sic], Aldridge, and LeFevers to address the pervasive and constitutionally inadequate conditions at FCCW" for causing the revocation of Plaintiff's bottom bunk profile and the allegedly foreseeable fall from her ladder. *Id.* ¶ 109. And she blames the "failure by Defendants Clarke, Robinson, Heerick [sic], Aldridge, and LeFevers to address the pervasive and constitutionally inadequate conditions at FCCW" for causing "the failure of FCCW staff to ensure [her] shoulder injury was appropriately diagnosed and treated," as a result of which she suffered burns "after foreseeably resorting to a customary, yet dangerous, self-help remedy based on the advice of a nurse." *Id.* ¶ 111.

The Court reiterates these serial, collective allegations at length to demonstrate just how—notwithstanding their verbiage—they fail to include any non-conclusory, individualized allegation of fact against any defendant. And "[t]he problem with this matter arises from the manner of the pleading," as Plaintiff has done no than "make[] only collective allegations against all Defendants," without identifying "how each individual Defendant personally interacted with [Plaintiff] or was responsible for the denial of [her] Eighth Amendment rights." *See Langford*, 2023 WL 2335957, at *2. But Plaintiff "needed to plead sufficient facts to plausibly allege that each Defendant actually knew about [her] serious medical condition and the risks of failing to treat him." *See id.*[2] Plaintiffs' complaint fails to include factual allegations in these collective allegations or otherwise that fail to even get close to plausibly establishing that core issue as to these Defendants.

Aside from these collective allegations, Plaintiff included several somewhat more individualized allegations against Defendants Herrick and LeFevers. Plaintiff alleges that, "[o]n information and belief," and "according to VDOC operating procedures," Plaintiff's "Informal Complaint," "Regular Grievance" submitted "in connection with the denial of her request to maintain a bottom bunk profile … should have been forwarded to both Defendants Herrick and Aldridge." Am. Compl. ¶ 51. Plaintiff also alleges that she submitted an "Offender Request" in which she sought "an appointment for an x-ray and to have her pain medication rescheduled." *Id.* ¶ 68. On information and belief and according to VDOC operating procedures, Plaintiff also

---

[2] The Fourth Circuit in *Langford* addressed an Eighth Amendment deliberate indifference claim brought pursuant to *Bivens* against defendant officials at a federal prison rather than, as here, at a state facility. However, the same deliberate indifference standard applies for Eighth Amendment claims brought by inmates at state prisons. *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) ("An official acts with deliberate indifference if he had actual knowledge of a prisoner's serious medical needs and the related risks, but nevertheless disregarded them.").

alleges two additional "emergency grievances"—of uncertain substance—"should have been forwarded to both Defendants Herrick and Aldridge." *Id.* ¶ 68. And again "[o]n June 15, 2020," Plaintiff alleges that she submitted the appropriate VDOC form to raise an 'Informal Complaint' regarding FCCW's failure to transfer her to a hospital." *Id.* ¶ 94. "On information and belief, that informal complaint was distributed to Defendants Heerick [sic] and LeFevers, who failed or refused to take reasonable action in response." *Id.* Finally, Plaintiff concludes that "Defendants Heerick [sic], Aldridge, and LeFevers failed or refused to adequately respond to the grievances and informal complaints that [Plaintiff] filed." *Id.* ¶ 106.

Far from being concrete allegations of fact, the above allegations are shrouded in uncertainty and caveats. Specifically, Plaintiff at most claimed that, "on information and belief," several grievances "should have been forwarded" to certain Defendants, and in one case, "on information and belief … was distributed" to them. While not per se improper, use of "on information and belief" in pleading cannot salvage otherwise conclusory allegations. *See Van Buren v. Walmart, Inc.*, 611 F. Supp. 3d 30, 36 (D. Md. 2020) (noting that under *Iqbal* and *Twombly*, "a complaint's conclusory allegations based solely 'upon information and belief' are 'insufficient to defeat a motion to dismiss"). No allegations explain why or how the Defendants "should have" received the grievances, present what VDOC policy would have generally directed their circulation in that manner, or provide any other facts indicating that any of the Defendants had reviewed or otherwise been aware of any of the grievances. Factual description about the content of the grievances is also wanting. The grievances are not attached. And, even accepting that these Defendants had received the grievances, Plaintiffs' allegations would at most show Defendants had some awareness that Plaintiff was aggrieved "in connection with the denial of her request to maintain a bottom bunk profile," that she requested "an appointment for

an x-ray and to have her pain medication rescheduled," and that she challenged FCCW's "failure to transfer her to a hospital." Am. Compl. ¶¶ 51, 68, 94. But awareness of those alleged facts about the grievances, without (much) more, falls far short of plausibly establishing "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Langford*, 2023 WL 2335957, at *2.

Finally, Plaintiff includes some separate allegation in reference to Dr. Targonski. Plaintiff alleges that she suffered tremendous pain on account of FCCW's treatment of burn wounds on her back. *See* Am. Compl. ¶¶ 77–92. Plaintiff alleges that, on June 2, 2020, a University of Virginia Hospital System nurse specializing in burn care previously came to FCCW to treat Plaintiff's burns, which included providing "narcotic pain medication," and that "some members of FCCW's medical staff" observed the care as "training." *Id.* ¶¶ 83, 86. However, the following day, June 3, 2020, Nurse Doe of FCCW "proceeded to aggressively rub gauze directly against the wound on [Plaintiff's] back without first providing any medication for pain management." *Id.* ¶ 88. Plaintiff alleges that she "was made to endure this pain in its entirety because, *on information and belief, Defendant Targonski had not yet given new orders to premedicate [Plaintiff] 30 minutes before wound care*." *Id.* ¶ 89 (emphasis added). That is the entirety of the allegation concerning Dr. Targonski's involvement. Even accepting the truth of the factual allegation that he had not yet given new orders to premedicate Plaintiff 30 minutes before wound care, that also fails to plausibly establish his "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Langford*, 2023 WL 2335957, at *2. Indeed, from that bare allegation, the Court cannot reasonably infer that, for example, Dr. Targonski had "treated or refused to treat [Plaintiff]," "saw [her] in the [FCCW] medical officers during the relevant time, or was even working on the

days in question." *See Langford*, 2023 WL 2335957, at *3. Nor that he had previously treated Plaintiff, was aware of her course of treatment, or was responsible at that time or going forward for giving orders to premedicate Plaintiff, or was subjectively aware that Plaintiff was in need of "new orders to premedicate … before wound care." Indeed, Plaintiff has not alleged any facts at all from which this Court could conclude Dr. Targonski was subjectively aware of anything about Plaintiff's case.

Plaintiff's supervisory liability claims fare no better. To establish supervisory liability, a plaintiff must allege facts sufficient to show that any defendant (1) "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff'"; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and the plaintiff's "particular constitutional injury." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Moreover, "[t]o demonstrate that a risk is pervasive and unreasonable under the first element requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (cleaned up).

Much for the same reasons as stated above, Plaintiff's conclusory and collective allegations fail to establish that any Defendant had any actual or constructive knowledge that any subordinate was engaged in conduct posing a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff. Plaintiffs' allegations concerning the *Scott v. Clarke* settlement and the Court's rulings that FCCW had failed to abide by the terms of the settlement agreement

*in that case*, are unavailing to supply facts to support that element *in this case*. Without delving into the lengthy factual background of the *Scott v. Clarke* litigation, Plaintiff is correct that the Court held in January 2019 that "VDOC's and FCCW's *own* officials had—by their *own admission*—actual knowledge that FCCW was not complying with parts of the Settlement Agreement." Am. Compl. ¶ 32; *see also Scott v. Clarke*, 355 F. Supp. 3d 472, 495 (W.D. Va. 2019). But that was over a year and a half before the events underlying Plaintiff's asserted injuries in this case.

Plaintiff tries to close that yawning gap by citing this Court's decision in May 2020, "contemporaneous with the events involving [Plaintiff]," which concluded that FCCW had breached the Settlement Agreement again. Am. Compl. ¶ 34. However, as Plaintiff's own complaint acknowledges, that decision concerned a discrete aspect of the *Scott v. Clarke* settlement agreement: specifically, whether FCCW or a third-party monitor was responsible for compiling quarterly compliance reports and sharing them with the plaintiffs' counsel in that case. *See id.*; *see also Scott v. Clarke*, No. 3:12-cv-36, 2020 WL 2263535 (W.D. Va. May 7, 2020). That has no bearing on the question here—whether any defendant "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff." *See Wilkins*, 751 F.3d at 226. Simply put, nothing in the allegations about *Scott v. Clarke* and several Defendants' positions as defendants in that case help establish that the first element of Plaintiff's supervisory liability claim.

Plaintiff further attempts unsuccessfully to springboard from *Scott v. Clarke* to generalized assertions of "known, widespread conditions at FCCW," including "denial of reasonable accommodations, denial of adequate care through the sick call process, denial of

reasonable or timely review of her complaints and grievances," and the like. *See* Dkt. 18 at 14. And Plaintiff alleges that Movant Defendants' "failure to act in the face of their knowledge of the conditions at FCCW was affirmatively linked to [Plaintiff's] injuries, each of which was reasonably foreseeable." *Id.* But these vague arguments similarly rely on little more than conclusory allegations. At bottom, Plaintiff's complaint offers no facts demonstrating that any of the Movant Defendants had actual or constructive knowledge that any subordinate was engaged in conduct posing a "pervasive and unreasonable" risk of constitutional injury to Plaintiff. As such, Plaintiff's supervisory liability claim fails as well.

\*　　\*　　\*

Plaintiff has failed to state a plausible claim that any Movant Defendant was deliberately indifferent to her serious medical needs as needed to establish a cognizable Eighth Amendment claim for denial of medical care, or that any Movant Defendant should be liable under a plausible supervisory liability claim. Accordingly, Movant Defendants' motion to dismiss will be and hereby is **GRANTED**. Dkt. 15. The Clerk of Court is directed to terminate Movant Defendants as active parties in this case.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to the parties.

Entered this  31st  day of March, 2023.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE